Before we start the clock, I just have a couple of questions. Now, you're with Bunker, right? No, Your Honor, I'm with the v. Trogir. You're with Trogir? Trogir, correct. Okay. So, you have two people here. Are you going to take all the time? I'm taking all the time, Your Honor, yes. All right. Then, technically, I guess we have a cross-appeal here? We do, Your Honor. So, that being said, you each have 15 minutes total. And so, while you're starting out as the appellant, you do have something that, on the other side of what they're appealing, where you would be able to respond. So, I guess if you reserve time, it needs to be time to reserve to not only respond to your own case, and then they would have the same situation as well. So, I'll try to – it's a little bit of a – makes it a little bit of a zoo, but I think you would each get a chance to respond where you're the appellant. In that regard, Your Honor, I would probably – So, go ahead and state your names, and we'll start the clock. May I please call, Your Honor? My name is James Marison. I'm with Kiesel, Young & Logan, and I'm representing the vessel MV Trogir and her specially appearing owners, Trogir Maritime, Inc. In relation to – Your Honor, I'd like to reserve five minutes, and to sort of simplify that, that five minutes would be to respond to any arguments that the opposing counsel makes to our appeal, and obviously our response to their cross-appeal. Your Honor, we will respectively submit that the District Court erred in granting summary judgment in favour of O.W. Bunker because there exist many issues of law and genuine issues of material fact which require judgment to be reversed and remanded back to the District Court. Firstly, the District Court erred in applying U.S. law in this case. As a prima facie matter, the District Court granted summary judgment based upon solely a term found in O.W. Bunker's standard terms and conditions. Specifically, O.W. Bunker was granted summary judgment based upon a choice of law provision contained in Clause P4 in their standard terms and conditions, which were attached to their verified complaint and can be found in the exerted record at 666. Specifically, P4 was what we have described in our brief as the itinerant choice of law clause which allowed O.W. Bunker to exercise rights, or purportedly exercise rights, in the jurisdiction wherever the vessel may be found. However, in that same set of terms at Clause L4, which can be found in exerted record at 663 to 664, there is a provision where, as here, the fuel is physically supplied by a third party, P4, the itinerant choice of law clause, is completely displaced by the choice of law provision that is found within the physical supplier's terms and conditions. As it applies to the facts here, Your Honour, we have documents which are described as bunker delivery receipts. I'm not sure how familiar you are with this particular type of transaction, but the entity that actually supplies the fuel to the vessel provides a receipt for the fuel that it supplies. Those receipts were also attached to the verified complaint. They can be found at... Well, is it your position, under the Ninth Circuit's opinion in TransTac Asia, that a choice of law provision in a supply contract must expressly state that the U.S. law will apply in order for the court to recognize a maritime lien under U.S. law? There are two things there, Your Honour. In the first instance, my first point is, we don't know what the operative choice of law actually is, because the operative choice of law that was provided in P4 is potentially displaced by L4, and there's no evidence in the record as to what the physical supplier's choice of law is. But I take it that, I mean, you've had full discovery now? We have not, Your Honour. Okay, but this was summary judgment. This was an early summary judgment, cross motions for summary judgment, before the close of discovery. Okay, and you could have brought a motion saying that we need discovery to remain open longer to adequately respond. Was there such a motion? I don't believe there was a motion. Okay, so you're stuck with the record you've got, and based on the record before us, I don't have any basis for concluding that the, I think you said it's the P4 provision was entirely displaced. We don't have anything. Well, there are a number of bases on which the court could consider this issue in its de novo review and appeal. Firstly, the standard terms and conditions were part of the record in the district court. They were attached to the verified complaint, and they were the terms and conditions which were moved on for summary judgment. Secondly, it was clear in the motions for summary judgment that my client disputed the validity and enforceability of the OW bunker standard terms and conditions. Well, I understand you're disputing the enforceability, but I guess what I heard you make as the first argument is that this choice of law provision that the district court relied on, we don't even know if it's the real choice of law provision that ultimately governed between OW bunker and the charter. Correct. Right, and I'm saying there's nothing in the record on which we could conclude that that choice of law provision had in fact been displaced, as you've argued, and you've had a chance to take discovery, and it was your burden, I think, to show that there was a disputed issue on that, and you haven't. But the... In response, Your Honour, the record is made clear in relation to who is to put forward the correct choice of law, and it would, I think, result in substantial injustice when it's clear from the record that there is potentially another choice of law that displaces the choice of law upon which summary judgment was provided. In effect, what the argument is, on appeal, we are to accept one choice of law and flatly ignore another potential operative provision. But we don't know if there is one, and I'm saying it seems to me you had the ability to take discovery on that issue. I don't know why you didn't. It seems to me there must be that document out there that you're referencing, but it's not in the record. So we don't have any basis to speculate that, oh, well, there might be this other choice of law provision that really governed. We're stuck with the one we have. So, I mean, I haven't heard you respond on the factual point. Maybe you can move to the enforceability point, because I do understand that you have arguments that even if that is, in fact, the choice of law provision that governs, your client and the vessel shouldn't be bound by it, so to speak, and I think that's why Judge Callahan brought up the Transtech case, which seems directly on point, the exact same factual posture, and we held there that the vessel, in effect, was bound by the choice of law provision. Turning to your point, Your Honor, in relation to the application of Transtech, there are two points to make. Firstly, in relation to Transtech, the steps in which Transtech determines whether a particular US choice of law provision goes through a series of questions. The first is determining the underlying law of contract formation. In this particular case, the court correctly found that Croatian law was the correct law that governed contract formation. The next position in Transtech is a determination of whether, in fact, pursuant to that law governing contract formation, the US choice of law provision could be validly incorporated in that contract. With respect, Your Honor, I believe that there is a gap in the Transtech analysis, which arrives at a point before a consideration of that circumstance, and that is to determine whether or not, as a matter of the law governing the contract formation question, that the owner can be bound to that contract. Well, you're relying on this no lien stamp, and did you proffer any evidence in the district court other than no lien stamps on the bunker receipts to rebut the presumption that a charterer may bind the vessel? I mean, you know, you can stamp anything on stuff, but that doesn't... Well, there's a number of issues here, Your Honor. The first is the no lien stamp of itself can, in certain circumstances, be sufficient to give actual notice. We... I'd like to distinguish between... But wasn't the gas... wasn't it already... they had already gotten the fuel, right? Well, there's a determination... Which is no simple thing, I think, as far as I can ascertain. In the first instance, Your Honor, the fuel was provided by a company called Sinopec. They were the people that actually put it on board the ship. That's evidenced by the bunker delivery receipts. There was, in fact, two suppliers. The first supply on the 6th of December was from 11.15 to 12.15, the smaller quantity of fuel. The second supply occurred between 12.40 and 17.40 hours on the 16th of December. In relation to the first supply, at the completion of that supply, a bunker delivery receipt was issued, and the chief engineer stamped that with a no lien clause. In effect, it gave that physical supplier, Sinopec, notice that the vessel did not have ability to... that the chief engineer did not have an opportunity to bind the vessel. That, in accordance with the cases, is ineffective because the bunker stamp was applied after the delivery of the first supply. However, there are cases which say that that act of a no lien stamp, provided its language is sufficient, can provide actual notice in relation to a subsequent supply of fuel. So in relation to our client providing actual notice to rebut the statutory presumption that exists under the Commercial Maritime Liens Act, we would say that we did, in fact, give actual notice to the physical supplier in relation to the second supply. And it also is worth bearing in mind, Your Honour, that the plaintiff, O.W. Bunker, was completely unknown to the owner. We had no idea where they fit into the contractual supply chain here.  who we can effectively give actual notice to is the person who comes alongside the vessel to put fuel on our vessel. And the person that did that supplied it twice. In relation to the first instance, yes, I understand the facts to be that the bunker stamp was applied to the bunker delivery receipt after the supply, which is ineffectual. But in relation to the second supply, which is by far the greatest supply, that stamp vested that supplier with a position to determine whether or not it should risk its lien by continuing to provide the fuel in relation to the second supply. That is significant in the context of whether O.W. Bunker has met the requirements of SIMR because a person in the position of the chief engineer who applied the stamp is presumed to have authority to bind the vessel. However, that presumption can be rebutted where actual notice has been provided to the physical supplier. We would argue that it has been. And the other issue is there is no evidence before the court to demonstrate how O.W. Bunker contracted in any way with Sinopec. Whether O.W. Bunker... You're at your five minutes if you want to rebut it. I actually wanted to take you back to the question I posed. When you jumped ahead to Judge Callahan's question, you skipped about two steps ahead in the analysis. Let's go back to TransTech. Your argument is that the FMLA or the CM symbol doesn't even apply here. And you were arguing that TransTech skipped a step in the choice of law analysis. And I wanted to hear what you had to say about that. TransTech has three steps on its face. The first is determining the law governing contract formation. The second step, as articulated in TransTech, is pursuant to that law governing contract formation, determine whether, pursuant to that underlying law, a US choice of law can be validly incorporated. And thirdly, if it's validly incorporated, you apply the SIMR standards, and if you meet the SIMR standards, you get a maritime warrant. Right. I believe TransTech's misstep being you need to determine whether an owner can be bound by a contract. I agree, and that's why I want to hear... That's not what the case says. I want to hear why do you think it was wrong on that one. It's simply not addressed on... It was not an issue on appeal. Judge Wilson, in the first instance, effectively held that the owner was not bound by the contract, and it didn't form an issue on appeal. And the Ninth Circuit, with respect, I think simply presumed that the contract had been freely negotiated with the parties. The Ninth Circuit became continually referencing that the parties had freely negotiated the contract, it was part of the party's choice, without actually appreciating that the owner hadn't either ratified, had knowledge of, or had any way of understanding or knew of the existence of the contract. Right, and that's what I'm saying. On its facts, it's just like this case. And nonetheless, what we held there was that American law did ultimately apply. And I guess I'm trying to... How could we write an opinion in this case that distinguished Transtech? Well, the easiest way to distinguish Transtech is that the choice of law provision in Transtech is materially different from the one here. Well, it's different, but I don't know how you could say it's material. Well, it's materially different in two ways. One, the choice of law provision in Transtech expressly asserts the party's ability to assert a lien. P4 from O. W. Bunker's contains no language that it can assert a lien. Well, it sort of does. I mean, it's not as crisp as the one in Transtech, but it sort of does. And the second issue, obviously, in Transtech, there was an express application to the United States Maritime Lien Law in relation to the existence of lien, whereas in this particular case, it merely contains the... P4 contains the language that it'll be the law of the jurisdiction wherever the vessel happens to be found in. But there is case authority which makes that specificity requirement material. There's the Queen of Lehman case and the cases that follow from that. And the rationale for determining that is because the majority of the world does not grant maritime liens for bunker delivery. The United States and France are apparently the only two jurisdictions which allow liens that are necessary. There are more than that, but those are the two biggest players, probably. But just saying, because your time is running out, is on that point that you're making, that Transtech skipped a step in the analysis and was wrong in thinking that the vessel or the vessel's owner was bound. Is there a case that's on point that's contradictory to Transtech? I believe the closest case is the Ninth Circuit decision in the Tinto.  The Tinto. I can provide the site for you, Your Honour. That was a maritime liens case which was determining a choice of law provision. But did you say it's from our circuit? It's in the Ninth Circuit, yes. From 1982, 694 F 2nd, 1191. Okay, but that's not going to help us do anything with Transtech later. Transtech is later, but to the extent that Transtech did not address an issue, that case could potentially provide some guidance in relation to whether or not that step should be considered in the process. Okay, you should preserve whatever time you've got. Thank you very much. Sorry for taking you over. All right, thank you. I'll kind of gauge. I might give you a little extra time. We'll see how we go if the Court continues to have questions. Good morning. Good morning, Your Honours. May it please the Court. My name is George Chalice, and I'm here on behalf of the plaintiff appellee, cross-appellant, O.W. Bunker Malta. And I'd like to start off by framing the issue with some broad comments. Here Today, Gone Tomorrow is a principle that the Supreme Court has recognized for a long time when it comes to maritime trade and transactions. And the Supreme Court uses the term peripatetic nature of shipping. So here you have a situation where that underlying principle, Here Today, Gone Tomorrow, comes crystal clear into focus about what the genesis of this case is. A supplier of necessaries, our client, fuels up a ship at the request of the charterer of the vessel. They issue the invoice, they wait to get paid, and they get a few sprinkles of cash, not much money, but they got two or three payments that came in. But it wasn't satisfactory, they were late payments, and it, in our view, was properly applied to the contractual interest from the contractual counterparty. And so, as our client went forward trying to recover on its unpaid debt, they watched the ship, and they followed the ship. And while counsel for the appellant argues that there's only a very few limited obscure jurisdictions that allow for liens for the provision of necessaries, that's really a glass-half-empty view, and it's a gross distortion of the glass-half-empty view. It's actually the glass more than half full because those 30-some-odd nations that allow for the lien are the maritime nations, and they're very important ports and waterways around the world. Can I ask you a question about there's a bankruptcy, right? Does that affect this in any way? At the moment, I don't think it does, Your Honor. I think it may in the future. Where is the bankruptcy? Is it here or somewhere else? It's a complicated mess, to put it very candidly. Is it overseas? In part overseas. There's a parent company, a Danish parent company, that's in liquidation abroad. There are some affiliates here that have filed a bankruptcy proceeding in Connecticut, which is in the process of potentially getting moved to the Southern District of New York. O.W. Bunker Malta has not been included in any of these proceedings as of yet, but we understand from trying our very best to get clear instructions on what to do with respect to our parents today, we understand that through a complicated series of assignments that ING, as a creditor of the parent company, with the assistance of PricewaterhouseCoopers, are administrating this gigantic... Has anyone stayed from doing anything? Not in this case, Your Honor. We were hoping that that would be the case. And you didn't want to come, but we made you come. I don't mind coming, but without a client to report to. Our client basically has closed the doors and turned the lights off. Well, I appreciate your background, but I kind of want to ask you some more specific questions. TMI suggests that it's inequitable and thus a violation of Croatian law for a choice of law clause to give the supplier a right to invoke the substantive law of whatever country the vessel enters. What's your response to that? Yeah. Well, you see, Your Honor, this is the great anomaly about maritime law. And actually, this circuit, the Ninth Circuit, is the one circuit that's spoken affirmatively. The analysis to be employed is you have to look to the contract formation. And the first step is to make sure that there's no prohibition on the incorporation of law and jurisdiction clauses. It doesn't look to maritime liens. It's a much broader preliminary inquiry. And that is, again, whether the parties are free to contract in their agreement for a choice of law and jurisdiction clause. And here, the district court, we say rightly found, that Croatian law doesn't prohibit that ability to contract. Now, what gets a little confusing, and I think this is one of the arguments we presented, that the vessel appellants confuse this in rem versus in personam ethos of the claim. Our claim is very narrowly tailored to the in rem claim based on the lien acquired because the vessel was here in a U.S. port under the FMLA, the Federal Maritime Lien Act. And so we think that, okay, as long as you get over that threshold burden that the Ninth Circuit says has to be checked first, can they contract for a jurisdiction clause like in P4 of our terms and conditions, then the next step becomes the Luritsen test. And does U.S. law apply? And we say transtex speaks squarely on that point. But we've also cited in our final briefing to the court, there's been two circuits that have looked at this very recently. Not in the context of a Rule C lien claim, but in the context of a Rule B maritime attachment case where the predicate is a maritime claim. And in those cases, I can give you the case names if it's helpful. It was the Blue Whale case in the Second Circuit. Shortly after that it was D'Amico versus Primera, also in the Second Circuit. And the Fourth Circuit recently issued a decision in a case called Flame versus ICI, Industrial Carriers. And what those circuit court decisions say, look, you know, we understand about this choice of law stuff and we understand all these things and we do agree that you have to look under the Luritsen test what's the most strongest connection. But they come out at the end of the day that the fact that the property is here, in our case, that the vessel was here, that the strongest connection is U.S. law because the property is here. Well, let me take you back a couple steps in the analysis that you were just talking about. I guess I am still stuck on the point that your opponent has raised. You can contract, you, your client, can contract with the Charter to come up with whatever choice of law provision you want. And that certainly will govern whatever action you can take against them. But why is the vessel, why does the vessel end up being bound by whatever it is your client has agreed with the Charter? That's what I don't get. Actually, I agree with you, Your Honor. I think that that's an odd step when you're talking about a lien claim. Because you're not talking about a claim that's based on privity of contract. And so I think, and I'm hypothesizing here, I think that when the Ninth Circuit put that step in, in the past, I think it was a more broadly intended test. Because that may be more important in a personal injury, maritime personal injury case, or a maritime tort case, that you'd have to look to the contractual relations of the parties at issue. But when you're talking about a lien claim, I argued in the Second Circuit, and I would suggest here, that you actually, in a lien claim, you could skip this step, looking at the contractual relations. But being bound... But if we did that, and we just applied the Loritzen factors, I would think your client would lose. Because there are, I mean, probably correlation law, but certainly some other country's law, other than the United States law, would apply, if we just applied the Loritzen factors straight up, without regard to this choice of law clause that you've relied on, right? Well, no, I would disagree, and I would advocate that that would be an improper application, because the Loritzen factors, six or seven factors, there is no mechanical test to how they apply, and there's no specific weighting to one factor being more important than the other. And Loritzen, of course, was a personal injury case with a Danish seaman with a Danish contract on a Danish ship, so it was just the fortuity that the vessel called in the United States. But here, I would say... Everything you just said applies exactly to this case. Our country has no interest whatsoever in this transaction. Except, Your Honor, I'm glad you asked that question, because you've opened the door for me to give you my views, which I feel very strongly about. The U.S. has all the reason in the world to apply U.S. law, because of issues of common, international common, and deference. Just as we want other countries to apply our decisions of our courts and our rules and laws, that we would do the same. So here, when you look at the Blue Whale case, the D'Amico case, and then the ICI case from the Fourth Circuit, they all say that looking to the Loritzen test that we're talking about now, the number one most compelling factor is the property is here. It's not... All the other stuff is... I would be with you if the necessaries had been supplied here. Then I'm 100% with you. But they were supplied in another country. And it's just... It's a fortuity, I think, whatever word you use, that the ship has to pass through our ports. Well, but you see, the Federal Maritime Lien Act doesn't provide those distinctions. Now, for rankings of priority, if there was a bankruptcy, a domestic supplier would come higher than a foreign supplier. But for purposes of meeting your threshold burden to obtain a lien, that distinction does not exist. So if you do the Loritzen test and you say, look, the most important factor, we have a Chinese supply with a Croatian company with an Indonesian supplier that transacted with a Maltese company. I mean, that is too scattered to give you one particular jurisdiction that would have the most interest in resolving the dispute. But when you say, wait a minute, let's step back. The property is here. The defendant is the property. So U.S. law must apply both procedurally and substantively. And again, I would cite to and suggest that the analyses in those two Second Circuit decisions and the Fourth Circuit decision, not perfectly square on point because it's a Rule B, not a Rule C lien claim. But it still gives you the same analysis that gets you to the same result that Transtec came to. Are those cases, did you say that you supplied a 28-J letter that gives us the cites or no? They were cited in our brief. Got it. Yes, indeed. And actually, just to be more clear about it, when we submitted our final reply brief, the Fourth Circuit case had not been decided yet. And so it was noted in a footnote that it was on appeal. But the Fourth Circuit has subsequently come down on that. And then if I could just, if the panel doesn't have any further questions on those points, I'd like to address our appeal just for a moment. Yeah. So just so that I understand the practical effects of it, that on your appeal, you ended up owing, what, like $70,000 because of how Judge Reel calculated and did the pre-interest or whatever. And as far as I can tell, well, the pre-judgment interest is committed to the district court's discretion. But I don't know why the judge picked, what the judge picked. So I mean, obviously, I don't think you did a great job of showing that the judge abused his discretion, which is your job. But on the other hand, I have no idea why the judge did what he did. Yeah. I can explain. Other than maybe to come up with some number. Judge, I hope I can explain to you in a more executive fashion and make the issues more simple. When I reread our briefing, I said, oh my God, this is too confusing. And so at the time when we wrote it, it was clear in my mind, but with the benefit of having some time and some hindsight. Here's where the issue comes in. Judge Reel, we agreed that there was a mistake in the initial order. And the initial order applied contractual rate of interest at 2% compounding each month. And so we agreed and we consented and we were submitting an amended order. And then Judge Reel asked for an accounting because this issue of the partial payments that had been received from the contractual counterparty was still alive at the time. So we submitted a declaration of one of the principals, a fellow called Paniotis Bactis who explained that, look, we got this money from our contractual partner, but we applied it towards the contractual interest because that's what our terms and conditions allow. And that's what Judge Reel had already said, that first contractual payments go towards interest and expenses and then towards principal. So after the judge got our accounting, he issued the amended order and directed us to return about $78,000, which was paid back and sits in an escrow account in the K. Rose law firm here in town. So what we have said is I think that the judge made a mistake of law, but actually not in his finding. He found that the right law applies, that the parties are entitled to the benefit of their contractual expectations, that we could apply the contractual payments first to costs and expenses, interest costs and expenses, but then in his application he went off the rails, and I say it respectfully, because what he said was you're entitled to the prejudgment statutory rate, which was a very small amount. So what we said is, no, look, we have, if we applied it correctly in accordance with our contract, that interest costs and expenses, mostly interest, almost all interest, went first. We had covered 171 days of non-payment interest due to us, and so we said, look, from day 172 onwards, if you did the calculation, that we're entitled to $238.56 of prejudgment interest, only $238.56. But what we said is by reducing our judgment by that almost $78,000, that was a mistake. So actually our appeal asked for three discrete findings. First, that we get our $78,000 approximately back, that we get an award for $238.56, which is the prejudgment rate according to the statute, and there's a third issue that's still sort of a lingering issue that sort of fell aside once the notice of appeal was filed here. We were entitled to submit a bill of costs under Federal Rule Civil Procedure 54 and Local Rule 54-3, and we submitted it. It was not challenged in any way, shape, or form. In fact, I would almost go so far as to say that it was acceptable to all concerned, but the clerk of the district court never taxed the costs, and that amount comes to $29,209.07. So all in, just to summarize for the panel, is that we say based on our cross-appeal, when you look at what should have been the proper prejudgment interest beginning on Day 172 forward, plus the $77,000 or $78,000 that we say was erroneously ordered to be returned, plus the taxable costs, which have not yet been properly taxed by the district court, we're asking for $106,706.07. If we were to send this case back on the grounds you're asking, in light of everything that's going on with Danish bankruptcy, would there be someone to appear in court to further litigate this issue before the district court? Absolutely, Your Honor. Well, I shouldn't be so bold. I expect there would be, and I'll tell you what we've been told, and I don't know if I'm coming close to the line of sharing client confidence. Well, please don't do that. I just want to make sure that if we go through this rigmarole and give instructions... Because we can't do the math. Right, understood. We send this back to the district court, and is it going to be another letter from you, understanding as a guy who's trying to make a living, saying, look, I haven't had contact with my client in a year and a half, and I don't want to do this anymore? No, I don't think that that's a real concern, and I'll share why. Our client, even though their lights are off and the doors are closed, their assets, at least, and maybe their liabilities, are somehow entangled in this big web of assignments. And what we were told is that the folks that are tasked with untangling this hornet's nest haven't gotten around to it yet. And so they keep putting us off, and they keep asking probably the most important question to the liquidators is are we getting money and how much? So, I mean, I am absolutely confident that if this was remanded and the question was who could come in and testify about the dollars and cents of it all, we would have a representative, authorized representative, available for that purpose. Okay, thank you. Thank you. You've gone over your time. I'm just going to see what comes up over here, and I'm going to go with my panel in terms of what other questions we need to have answered. Thank you, Your Honor. Your Honor, addressing your point in relation to the maritime liens, and the Lawrenson factors. Fundamentally, from the very first beginning, maritime liens arise by operation of law. They do not arise by contract. And one of the issues that I would submit to the court is that the use by foreign suppliers by inserting U.S. choice of law clauses tries to do indirectly what they can't do directly, and that is create a maritime lien by contract. If I have no contact to the United States whatsoever in relation to the supply of my fuel, I can nevertheless purport to avail myself of remedies in the United States by inserting a U.S. choice of law clause. And I don't necessarily believe that that is the correct approach, but in the Ninth Circuit we have to deal within the confines of TransTech. What was that other Ninth Circuit case you said it was Tinto or something? Tinto. What's the site? The site is 694F2D1198, and the relevant provision is in relation to the footnote 8 right at the bottom of the page. And really, it relies upon the Second Circuit decision in Rainbow Line, which is another case. And we would submit that the Tinto combined with the Ninth Circuit's decision in Equatorial really examines this issue as to whether or not a non-party can be bound by a contract. Okay. Thank you. Okay. Well, you're in overtime, but why don't you take two minutes and respond to the numbers? Your Honor, I would just simply say two things. One is the analysis of the cross-appeal is potentially rendered moot in the sense that summary judgment is reversed and remanded. And secondly... Well, okay, but you have to... you've got to take that next step because we don't know what we're going to do at this point. As to that, Your Honor, the only... other than submitting on our brief in relation to the numbers, because I, like you, can't work out precisely what the district court judge did, we would simply say that, again, maritime liens arise by operation of law. What the contractual interest and contractual attorney fees is trying to enforce the in personam rights that OW Banker has, not those rights that arise by operation of law. Simply, what should have happened is whatever lien is valued by operation of law, together with any statutory prejudgment interest that's allowed, is awarded by the court. If OW Banker is upset because it believes that there are contractual attorney fees or interest provisions that remain outstanding pursuant to their contract, they're perfectly at liberty to pursue their contracting parties to recover that amount. Well, so, in a nutshell, if you were to lose on your summary judgment argument, are you basically saying that they didn't meet their burden to show that the judge abused his discretion? Yes. That's what we're saying. Okay. The judge applied the correct legal principles and there was nothing illogical in the manner in which he applied those principles to the calculation of the statutory interest and attorney fees, which he deducted from the judgment that we subsequently paid. Alright. Before we submit this case, I want to make sure, because it is complicated and I'm having the cross appeals, if either of my colleagues have any additional questions they want to ask of either of the lawyers. I don't have any questions of my own, but were there any other points you wanted to respond to on the merits? No. We're happy to submit on the brief, Your Honor. Thank you. You were already two minutes over. So, unless my colleagues  you don't have any more time. Okay? Thank you. Alright. This, these, we, our court will be in adjournment for the week Thank you, counsel, both for your arguments.
judges: Callahan, Watford, Owens